May it please the Court, James Monson Broughton for Dr. Dara Parvin Appellate. I would like to reserve five minutes for rebuttal. Thank you, Your Honor. Your Honor, I would like to focus on the issue of the negligence claim here that should be extended to what insurer are responsible for in terms of the state, the Oregon State Supreme Court's decision in Georgetown Realty. I must say that I saw an interesting abstract issue, but if you would begin by telling me what it has to do exactly with this case, it would be helpful. Yes, Your Honor. Basically, the conduct of CNA was so negligent in the record shows on DeNovo Review that the way they handled the defense, the positions that they put their insurer, Dr. Parvin, in were so negligent or grossly negligent that they violated a standard of care. And the question of the standard of care is, does that apply in a situation beyond a policy limit? Georgetown, beyond the policy limit, one of the core elements of an insurance contract is how much are you insured for? You mean within policy limit? Yes, within policy limit. But if they don't, the general background is if they don't settle a claim within the policy limit and it goes to trial and then the judgment exceeds the policy limit, then the insurance company could be sued. So let's assume yes. What does that do to this case? What difference does it make? Well, the question is, does the standard And we still have the fact that there was a consent provision and the key issue is whether the consent was obtained. And if the consent was obtained, would there still be a negligence claim? Potentially, Your Honor, because of the way the defense of Dr. Parvin was handled, where they were negligent in settling the case, even with consent, because 75 percent defensible when we settled. That's a handwritten note by Melanie Spearing of CNA. That is negligent, 75 percent defensible when they settled. That is on the record. Where did you get that from? I'm sorry. Pardon, Your Honor? Where is that from? That is excerpt of record 281. That was post hoc, right? Pardon? That was post hoc. That is correct. That was after the trial, yes. But at the time, the last evaluation they had was something like 30 percent. Well, that was before the trial, Your Honor. And I think the critical factor here is this decision was made the night before the jury verdict after three days of trial. And instead of focusing on competent counsel of 20 years, Rod Norton, they followed the advice of Norrie Quam, who was not having even sat through a jury trial. And making this critical decision in Dr. Parvin's life, whether or not to settle the case or allow the jury to hear the case, they did not follow Rod Norton's view of the case, which he thought they would settle. And that's in the record before the court. Counsel, this record is full of opinions as to the value of this case, whether it's a 75 percent, 30 percent. I mean, I fail to see how that really in and of itself, as trial counsel throughout this country would say, it varies, it's a matter of opinion, but it does not make this negligent, the settlement negligent, does it? I believe that there's parts of the record that show that it does, where, for example, the day the decision was made by CNA, the CNA's insurance agents reviewing this say the defense for Dr. Parvin's experts did an excellent job. Dr. Parvin did an excellent job. Now, granted, it is somewhat of a subject decision, but where the case is proceeding well, to settle the case in the middle of that trial under these circumstances would be negligent. And the question with Georgetown Realty is, does the standard of care in defending Dr. Parvin allow a tort for negligence where the defense is true? I mean, the thing that's unusual and interesting about this case is that Dr. Parvin's interests and concerns were not entirely directly financial. In other words, he had this whole set of concerns about his reputational interests, essentially. And if I may, Your Honor, this is a critical factor. It's almost like getting a felony conviction, a $1.5 million settlement on a doctor's record for National Data Bank. In the record, Dr. Parvin testified to that. That that is a horrible mark to try to get admissions into hospitals. Is there any case, and I understand the concern, and it comes up in other kinds of cases, too, like automobile cases where people get marks in their record and so on. But I was looking a little, and there's certainly nothing indicated in briefing about cases that specifically deal with that question. That is, does an insurance company which has accepted, which has the duty to defend, supposed to take into account those kinds of collateral interests of the, strong but collateral interests of the insured as opposed to simply the economics of the particular case? Is there any case law on that directly? The closest case would be the Georgetown Realty case, Your Honor. But that's not anything about this. That's about something completely different. If I may, Your Honor, the Oregon Supreme Court went through the history of this duty. Like, for example, attorney-client duty when they, for example, Dr. Parvin in this case did surgery. Let's just say hypothetically he had a contract, did the surgery for $100,000. But now, like with that relationship, that duty, he could be sued for $4 million like he was. Similarly, where an insurance company undertakes to defend an insured and has a special relationship, even though they have this policy limit of $5,000 or they got their pay, they could still be sued for similar wrongs or harms. And that's the point that the court says here in 313 Oregon 111. The kind of relationship carries with it a standard of care that exists independent of the contract and without reference to the specific terms of the contract. I know, but I was asking for a case. Counsel, what's your? Go ahead. No, Judge Bonner. Oh, okay. I was going to ask, what's your response to CNA's argument that your client did have within his control the ability to protect himself against the purely reputational harm by instead of getting this policy, getting a policy that required his own personal consent rather than the consent of this committee and that had he chosen that other policy, it may well have been more expensive, but he certainly could have protected himself in that way. What's your response to that? I would indicate that the, in this particular case, Dr. Parvin trusted the doctors of the Oregon Medical Association and that by defendants' own business records, it's clear their decision was, there was medical support for Dr. Parvin's case and that the committee decision was not to consent to settle. Well, I have a few questions about that. But you, for whatever reason, decided to start on the negligence claim. I want to ask you about the breach of contract claim in a second. But assuming that the committee did, in fact, consent, right? Your client gave up the ability to have, you know, his reputational interests sort of take precedence, right? He kind of relinquished some control to this other entity. And I guess I'm asking, why doesn't, whatever concerns you have about the tort duty that might exist, it seems to me it could have been resolved by way of contract and your client just chose not to, to do that. Your Honor, I'm not able to speculate why Dr. Parvin, prior to all of this, didn't choose a separate contract that would have just allowed him the veto power of consent. But really, the contract language itself says, we, CNA promised, we will not settle a claim. So the standard part is, the status quo is, we're not settling a claim. We will defend you. We won't settle a claim. An affirmative promise. And so. Without your consent or the consent of the committee. And they got the consent of the committee. So, if they got it. But you know what, your time might be running short. Let me ask you about the breach of contract claim. As I understand it, the, well, you tell me this. Of the doctors who served on the PCC, who other than that one doctor whose name I'm now going to forget, of course, who was deposed? Which of the doctors who served on the committee were deposed? It was just Dr. Rosenbeck, Your Honor. Yeah, that's it. I'm thinking of Rosenbeck. Okay. So, as I understand it, his testimony is that at that initial meeting, I guess, before trial, consent was denied, correct? Yes, Your Honor. And then I understand his testimony to be that the committee never reconvened after that. That is correct. Because the meeting during trial got canceled, right? That is correct. So, I guess, why isn't there a factual question as to whether consent, in fact, was given? That is the question. That's why we're here on DeNova Review asking for a jury trial. Dr. Parvin just wants this court to go back to district court to allow him to present his facts and evidence before a competent jury to make that decision. Was there consent? And there is evidence in the record to support disputes of that. Extensive records and multiple sources from CNA's own business records, e-mails, and even communications to a corporate vice president from Melanie Spearing. I asked her in deposition, would you have told him about the committee's decision? And she, later on, it's in the record, said, yes, I would have told him they did not consent. It's clear that there is a dispute of facts between whether or not they consented or not. Well, wait, does it matter whether they, in the end, in the end, they were told that by Dr. Rosenblatt, essentially, that they had consented, right? I mean, he said something to the effect of, oh, well, we already said, you know, you can, you can, which isn't exactly what they said, but he says what they said was that you can settle during the trial, essentially, when you think you should. So does it matter whether they, the insurance company, at the time they settled, at the time they settled, thought they had consent, even if one could reread the record and say, well, they didn't really have consent? It would matter, but I would indicate that the record shows there's a dispute of understanding of that. But the woman who thought she didn't have consent at the outset then went and made these inquiries, and these are the answers she got. So at the point they made the decision, did anybody think they didn't have consent? I would argue that, Your Honor, I would show that the record shows that Melanie Spiering, it was clear that they didn't have consent, and that this e-mail. Well, she was clear about that, and therefore went to Dr. Rosenblatt, and therefore was told she did have consent. It would matter if that e-mail sequence was admissible, was not privileged, and was not fraudulent. And that's the case before the jury here. There's these e-mails. Wait a minute. So what is the argument that it was not admissible, not fraudulent? Well, it's pure say. I would argue that the e-mails between CNA and OMA were classic hearsay, not verbal acts, like a thumbs-up or a high-five or an okay. That's a verbal act. As CNA says, they were classic hearsay within hearsay of third parties, number one. Number two, they're privileged under the Morgan statute as medical communications from peer review. Number three, the fraud here is that Dr. Rosenblatt, Paul Frisch, have been with OMA for 20 years and have a, I would argue, and there's evidence, a backdoor solution. Okay, Dr. Parvin didn't consent. The PCC committee didn't consent. Now we have last minute, last hour, oh, well, I just thought I remembered. Yeah, I guess we did give consent. And there's evidence that that is not accurate because one of the quick — Wait, wait, wait. Counsel, I'm sorry. Just help me with the Dr. Rosenblatt testimony. Did he testify during his deposition that he, in fact, during the trial communicated consent to the CNA person? The critical difference, Your Honor, I mean, Judge Walker, is that Dr. Rosenblatt did not call Melanie Spearing. And there's this back and forth of saying, oh, he recalls calling another doctor, but not calling Melanie Spearing. And the fact that it wasn't by telephone, he agreed that it wasn't by telephone. He did not call her. And Melanie Spearing says in her e-mail, I called and spoke with Dr. Rosenblatt. That's evidence of a phone conversation that never happened. Yeah, I'm just trying to get straight the Dr. Rosenblatt testimony. What I remember is that the CNA person, I'm sorry, what is her name? There were two of them, and Melanie Spearing was involved in this portion. That's the person who sends the e-mail saying, hey, I just spoke with Dr. Rosenblatt. We've got consent, right? Yes, and there's evidence. And then I thought that he was deposed and asked about that conversation and said, I don't remember ever talking to her. That is correct, Your Honor. That's in the record under oath in the deposition. So is there some other place in the record where Dr. Rosenblatt nonetheless says, oh, yes, but even though we denied consent before trial, at some point during trial, the committee convened and we rethought that and did consent? I believe that is in the deposition later on in a different portion of Dr. Rosenblatt's deposition. However, there's bias of 20 years of relationship going to Hawaii, Palm Springs, other things for CNA, as met the chairman of the OMA PCC committee, as well as Paul Frisch also. He was deposed, and there's evidence that he as well was subject to this bias, which is a perfect jury question, which is why we're asking for a jury trial. Okay. If you want to reserve any time to do that. Thank you, Your Honor. Yes, Your Honor. Good morning, and may it please the Court. Dr. Parvin's claims here revolve around a surgery that Dr. Parvin himself admitted that he, quote, botched, and that settled for a fraction of the policy limits. The insurance- Where he conveyed that, yes, the committee did reconvene and we did consent during the trial? Yes, Your Honor. Where is that? Judge Watford, that is S.E.R. 94. And to further answer your question, on S.E.R. 96, there is an e-mail sent by the general counsel of the Oregon Medical Association, Paul Frisch, that confirms the consent that ZNA obtained from the professional consultation committee. On S.E.R. 103 is an e-mail, again, from the entire PCC was copied on that e-mail, including- But counsel, tell me if I'm wrong on this. I thought that those, the Frisch representations about consent having been obtained were based on an understanding of what happened at that initial meeting, right? Correct, Your Honor. I think- Yeah, but, okay, so that's the problem I see is that Dr. Rosenblatt is the person with the most direct firsthand knowledge of what happened at the first meeting. And as I understand it, during his deposition, he said consent was denied at that initial meeting. No, Your Honor. That's not quite right. So what happened, yeah, it is true that consent was denied in the sense that the order was to proceed to trial with the following parameters. That happened on July 16th. That's laid out in the e-mail. And so then what happened was ZNA came back to the PCC and said, look, you denied consent. We want your consent to settle. And then Dr. Rosenblatt said, wait a second. This is all by e-mail. Wait a second. You already have our consent to settle. Now, keep in mind, Judge Watford, the only people in that room were the PCC members. Dr. Parvin wasn't there. ZNA wasn't there. So when we asked, we thought that there wasn't consent. And when we re-approached the PCC, we said, we need your consent. And the PCC says, you don't need our consent. You already have our consent. And that's laid out in SER 96 and in SER 103. That specifically lay out, and 103 is the e-mail where the entire PCC is cc'd, and they say, quote, the committee has already authorized ZNA to settle the case at any time it deemed appropriate following the testimony of Dr. Parvin. Dr. Rosenblatt is on that e-mail, as is Paul Frisch, the general counsel of the Organ Medical Association. There's no dispute, by the way, that at the time that ZNA approached plaintiff's counsel in the underlying case, that Dr. Parvin already had testified. So even if it was deemed conditional, we met any condition that could have existed. And then, Judge Watford, it is true and there is confusion because on this initial meeting, the decision was to proceed to trial. And so plaintiff's counsel here is relying on that initial understanding, saying, yes, proceed to trial. But then we asked and we stated, Dr. Rosenblatt, was there consent to settle? And Dr. Rosenblatt said unequivocally, and this is on SER 94 in its deposition, that, yes, there was consent to settle under the OMA. We follow the contract to a tee. That's exactly what we did here. So on our mind, there is unequivocal evidence. So consent was essentially conditional. Maybe conditional isn't the right word, but as I understand it, it was. You can settle during trial when, in your judgment, you should settle. Right? Following, yes, if, in your opinion, the case is not going well, and following, after Dr. Parvin, or after Dr. Parvin has presented his case, had the opportunity to present his case and his testimony, that's correct. That's the result. So essentially, what that says, assuming that that was the character of the consent, really that just puts all of the judgment back on the insurance company. In other words, it can't be an override of the insurance company's decision because it was essentially a consent to do what, in your judgment, should be done. Well, but put yourself in the shoes of the insurance company here. What more could CNA have done? We went to the PCC and asked, we need your consent. Well, I understand that. But all I'm saying is, in terms of this notion of whether there was a negligence claim and whether the contract consent essentially overrode it, it seems to me that this kind of consent couldn't have overridden it. Any other cause of action it may have had because it was not an unequivocal consent. It didn't say, we agree that it should be settled now. It was basically, if you think it should be settled now, go ahead and settle it, right? Well, look, there were serious issues in the case, right? The trial counsel stated that going to trial would be like taking a lamb to a slaughter, is what their trial counsel stated, Dr. Parvin's trial counsel. He compared it to the scene in Butch Cassidy and the Sundance Kid, running out against the entire Blvd. But retroactively, he said otherwise. Well, that's not quite true. Yes, he did say that there is a potential chance. But to the Oregon Medical Board, he stated, and this is on, I believe it's the ER 279, he wrote a letter to the Oregon Medical Board saying that the settlement was fair when Dr. Parvin was trying to retain his privileges to still practice in Oregon. So it's true, even if it was a 75% chance, let's even take that there was a 75% chance that there would have been a defense verdict. Okay? Despite the fact that the defense expert admitted that the needles crossed. In other words, the needle from the left side went into the right side, and the right side went into the left side and punctured this woman's spinal cord. Let's assume that there's a 75% chance. Well, it actually settled for around two-thirds or one-third of the actual, there were about $4.5 million in damages. The settlement was for 1.5. And that was the final offer from the Plaintiff's Counsel, take it or leave it. And remember, the negligence standard, Judge Berzon, to answer your question, we have not, from the Plaintiff's Counsel, we have not found a single case in Oregon or otherwise where, in this case, for example, has allowed a negligence claim when an insurer settles within policy limits. There's no case, not just from Oregon, there's no case from anywhere where negligence is in that situation. And Georgetown Realty and Maine Bonding talk about, yes, there could be negligence, but the whole idea is for the insurance company to pretend that there are no policy limits. That, in other words, the insurer bears the entire risk of exposure. And that's, of course, exactly what happened, because we did bear the entire risk.  There is something intuitive, not intuitively, but logically, that seems to me sound about the notion that if you're undertaking to represent someone who has interests in the litigation that are non-economic or not directly economic, that you have an obligation to pay attention to those considerations as well. Are you contesting that? Yes, no case has ever held that. And, in fact, the negligence standard is solely If he had his own lawyer, certainly his own lawyer would balance the effect on his reputation against the immediate judgment and make a recommendation. If he had a clause that required his consent, that would have been the same thing. But he didn't buy that policy. And, in fact, he bought a much lower-priced policy done through the Oregon Medical Association that allows not just him to consent and to say that what that would do, which person would effectively negate across the country. There are literally thousands of these contracts. Just on the Oregon Medical Association has thousands of members. Almost every single one of them has this. So just in this one state, in this one form contract, he would negate that entirely. But that kind of consent later, I mean, the consent provision, I suppose there was no consent provision of any kind. I mean, I'm trying to get a handle on what the duty of an insurer was taken to defend, undertaken to defend an insurer in a case in which there are, the insured has obvious interests that are not directly in the amount of the judgment. Does the insurer have any obligation with regard to those concerns? No. The only cases that have addressed negligence have been, and this is in the main bonding case in Oregon, the only cases that have addressed negligence with respect to the potential conflict between the insured and the insurer is in the context of excess claims. Because generally what happens is, of course, that there is a conflict in that particular circumstances. Because the insured wants to pay within limits and the insurance company doesn't want to pay up to limits. And so generally in that circumstance, you have to have evidence that there would have been an offer and that the plaintiff, underlying plaintiff, would have accepted an offer. But main bonding, and I would urge the court to read main bonding, it's right on point. Now, there is from other jurisdictions, this is not in our briefs, but we went back and looked, the only thing we could find remotely relevant to this are two cases from Florida, the Sharpe and the Schuster cases that reject the policy that Judge Berzon, you were asking about, that can you consider these reputational harms that go beyond just whether you pay within policy limits. Because keep in mind, the conflict here, that potential conflict that the courts across the country try to resolve is not whether you're paying for reputational insurance or the other harms that might befall the insured. It's the conflict of the payment that exists when there's a policy limit. And that is just not implicated at all in the context when you're settling within policy limits. Counsel, I'd like to ask you a question that turns to damages for a moment. Because that's common to all the causes of action here. And I think you've taken the position that the settlement wasn't a substantial cause of damages to Dr. Parvin. Well, that is absolutely correct, Your Honor, and I do want to And I'd like you to elaborate on that position, sir. Absolutely, Your Honor. A separate and independent grounds exists for dismissing all of these claims on causation and damages. And so the CNA satisfies any test on causation because, of course, there is a settlement within limits. And Dr. Parvin argues that the Mason settlement caused him to lose other jobs, prevented him from making mortgage payments. Not only are these nonrecognizable harms in the first instance, Dr. Parvin has no admissible evidence to demonstrate how these harms are connected to the Mason settlement. Counsel, what about just the drop in his own revenues from his own practice? That seems perfectly logical that a doctor who does spinal surgery and has settled a claim that he paralyzed one of his patients and had to pay $1.5 million. The notion that after that your clientele would drop off just strikes me as so obvious that I don't know what more you would need to put on in terms of evidence other than documentation that, in fact, your revenues had declined precipitously. Well, Judge Watford, that's not at all what the – potentially that could be a case, but that's not this case. And I would point you to ER 384 to 392, which are the plaintiff's tax returns, which actually show that there is a $500,000 improvement from year to year before and after the settlement. And we have the testimony from Dr. Parvin himself on SER 82 that he, quote, voluntarily reduced his caseload because of the investigation of the Oregon Medical Board that had nothing to do with the Mason settlement. I thought the increase had to do with his other interests, but not necessarily his practice. I didn't understand the question. I thought the $500,000 increase was not tied to his revenues from his practice. Well, we can only look at his income. I mean, the whole point is we can – I thought he demonstrated that his actual practice had gone down. I would just point you to ER 384 to 392, which has all of his income from that. He's looking at revenue. Yeah, the revenue numbers go down because he had other doctors who were practicing with him, and those doctors left. That has nothing to do with the Mason settlement. And, look, we still have to tie – We don't know that either. Excuse me? In order to prevail in summary judgment, you have to demonstrate that that jury could not have found that there was any causal effect, even if it was only partial, right? I mean, even if there were other judgments and there was a sexual harassment suit and everything else, still, if this was some part of the decrease, he would be entitled to go to the jury on it, right? Well, yes, but, Your Honor, Judge Berzon, there were three other – he was asked this question, plain as counsel was in the district court, that he was unable to point to a single e-mail where the Mason settlement was even a partial cause of the alleged reduction in practice. The only e-mail that exists was an e-mail from Phoenix, this is in the record, that ER 26 is when the district court judge addressed it, where he was talking about the three other malpractice cases that Dr. Parvin had, the sexual harassment lawsuit that Dr. Parvin had, and the fact that Dr. Parvin himself blamed his competitors for things like purposely contaminating his instruments. Well, fine, but this was still a part, one of those – one of the several things that they were concerned about, right? There's no evidence – no, Your Honor, they don't even address that at all. There's not a single shred of evidence anywhere from any non-hearsay source that except Dr. Parvin's own say-so on this list of 70, look, I could say that I went to the moon 70 times. No, no, I wouldn't – the particular e-mail that you're talking about, right, this job he applied for where they said it was, you know, he was kind of weird or whatever, this malpractice judgment was not among the things that they did. No, it's not. No, it's not. You're talking about other malpractice cases. How do we know that? Because that's – you can look at the – and that's not challenged. It was talking about other malpractice cases, not this one in particular, the one that was already pending, the sexual harassment suit. I do want to – I know my time's up. I want to make one key point on this damages issue, which is that the district court excluded the damages testimony and the causation testimony on Daubert grounds. Plano's doesn't even raise that. That's an abuse of discretion. That's totally way – so you can't even get to causation, and that's another independent reason for dismissing this case, solely on the fact that he hasn't even challenged that Daubert rationale. And just briefly going back, if I may, just finish one last thought on the list of 70 alleged job offers. None of them, Judge Berzon, talk about this case specifically in any admissible form. The only one is that Phoenix email that talks about the other cases. Thank you. Thank you very much. We'll give you a couple minutes to rebuttal. I'll say two minutes. Counsel asked what more could CNA have done in terms of the OMA PCC decision, and in the excerpt of Record 286, there's an email between Melanie Sparing and Paul Frisch, counsel for the OMA, you know, should we get something in writing to say what this decision was, you know, just to make it really clear. And they decided not to. And Melanie Sparing, as a CNA actor, agent, employee, said, no, we don't get anything in writing. And so we're agreeing with Paul Frisch. So I think that there is something more they could have done that could have had a very clear understanding from the OMA what that decision was. And in terms of the damages issue, Dr. Parvin did prepare and present this chart of 70 or more jobs he had applied to. And here we have a doctor who's earning gross revenues, millions of dollars, highly successful, and up until 2008. And then these are jobs he testified he couldn't get, he applied to, he didn't get. And that is just inconsistent with his ability to maintain a successful practice in a small, poor area of rural Oregon, making over a million dollars in gross revenues, and then going up until 2008. So even though there's not a specific email, Dr. Parvin does summarize that in that chart in the record. And so also I'd ask the court to consider in the record and to overview Dr. Parvin's own statements about how this $1.5 million settlement would affect his ability to get employment, and that it did harm him, and that it did cost him his business, the spine institute he built of $6.5 million property lost because he couldn't keep up the practice. So. Just a quick question. Let's talk about the fraud claim for a moment. Yes, Your Honor. How or in what way did Dr. Parvin justifiably rely on any misrepresentation from CNA? Well, first I'd indicate CNA indicated in their brief that it wasn't pled in the complaint, but the pretrial statement amends that. And so it does indicate that Dr. Parvin did rely on CNA's misrepresentation. In what way? Be specific if you can, sir. That CNA presented to the trial judge that they had authority to settle and they had settled the case. And if Dr. Parvin was able to contest that fact, they had authority, they didn't have the decision to settle it and they didn't have authority, then the court could have let it go to the jury and had this decision. Dr. Parvin relied on, although he disagreed with it all to the end, Dr. Parvin still relied on the CNA's statements that they had settlement authority. So that fraudulent statement by CNA to Dr. Parvin did not allow Dr. Parvin to say that they do not have authority to the judge. Okay. Thank you very much. Thank you. Thank you. Thank you, sir. Parvin v. CNA Financial Corporation is submitted and we will take a break.
judges: Berzon, Watford, Sammartino